DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Clare Blair, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him an additional award for an alleged violation of a specific safety requirement ("VSSR") by his employer, Warren Fabricating Company ("Warren"), respondent, and to enter an order granting a VSSR award.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. Relator has filed objections to the magistrate's decision.
 {¶ 3} Relator contends that the magistrate's decision does not address the issue raised by the commission's order and his mandamus lawsuit. Relator argues that the magistrate incorrectly framed the pertinent issue as whether Ohio Adm. Code 4123:1-5-05(D)(2) plainly apprised Warren that it had a legal obligation to shut down its machine during the reservoir refill procedure and implement the lockout/tag out procedure. Relator claims the actual issue in mandamus was whether Ohio Adm. Code4123:1-5-05(D)(2) required Warren to give him a warning tag to place on the controls of the running/idling machine so that the operator would not operate the machine while relator was cleaning, adjusting, or repairing the machine and whether Warren was immune from the requirements of Ohio Adm. Code 4123:1-5-05(D)(2) because the machine was running/idling.
 {¶ 4} The ultimate issue before the magistrate was whether Warren failed to comply with an applicable specific safety requirement. SeeState ex rel. Trydle v. Indus. Comm. (1972), 32 Ohio St.2d 257. Because specific safety requirements are unenforceable to the extent they fail to "plainly apprise" employers of their legal obligations to employees, Stateex rel. Waugh v. Indus. Comm. (1997), 77 Ohio St.3d 453, 456, a VSSR results only when an employer's acts contravene express statutory or regulatory provisions. In the present case, Ohio Adm. Code4123:1-5-05(D)(2), by its clear and unambiguous terms, applies only when machines are shut down, and it is undisputed that the machine in question was not shut down. Thus, the only way that the magistrate could have found that Ohio Adm. Code 4123:1-5-05(D)(2) applied to the current case would have been to find that Ohio Adm. Code 4123:1-5-05(D)(2) required Warren to shut down its machine. Therefore, the magistrate's conclusion that there could be no VSSR because Ohio Adm. Code 4123:1-5-05(D)(2) did not plainly apprise Warren of a legal obligation to shut down the machine went to the crux of the matter, and that finding necessarily precluded recovery for a VSSR, regardless of relator's specific arguments.
 {¶ 5} Relator complains that the logical consequence of the commission's and magistrate's decisions is that employers can avoid the application of Ohio Adm. Code 4123:1-5-05(D)(2) entirely by merely keeping their machines running during repair, adjusting, or cleaning operations. Relator asserts this is absurd because it rewards employers for practicing unsafe procedures. However, what relator requests of this court is that we read into the rule a specific safety requirement that employers give the employee a warning tag to place on the controls of the running but idling machine so that the operator will not operate the machine while the employee is cleaning, adjusting, or repairing the machine. Ohio Adm. Code 4123:1-5-05(D)(2) simply does not require such, and if we were to read such a requirement into the rule, we would unfairly dispense with the notice requirement. Further, by imposing the duty relator proposes, we would encroach upon the commission's rule-making authority. It is not the duty of this court to legislate such a requirement where the promulgators of Ohio Adm. Code 4123:1-5-05(D)(2) have chosen not to do so. In sum, the language of Ohio Adm. Code4123:1-5-05(D)(2) is clear: The rule applies only when machines are "shut down." We cannot find the commission abused its discretion in concluding such. For these reasons, relator's objections are without merit.
 {¶ 6} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
KLATT and McGRATH, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
 State of Ohio ex rel. Clare Blair, :
 Relator, :
 v. : No. 04AP-1134
 The Industrial Commission of Ohio, : (REGULAR CALENDAR)
 Warren Fabricating Company and :
 RW Melanson Cleaning and Painting, Inc., :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on April 27, 2005 Boyd, Rummell, Carach Curry Co., L.P.A., and Walter Kaufmann, for relator.
Jim Petro, Attorney General, and Dennis H. Behm, for respondent Industrial Commission of Ohio.
Ambrosy Fredericka, and Curtis J. Ambrosy, for respondent Warren Fabricating Company.
Blair Latell Co., LPA, and Matthew J. Blair, for respondent RW Melanson Cleaning and Painting, Inc.
IN MANDAMUS
 {¶ 7} In this original action, relator, Clare Blair, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him an additional award for an alleged violation of a specific safety requirement ("VSSR"), and to enter an order granting a VSSR award.
Findings of Fact:
 {¶ 8} 1. On January 13, 2000, relator sustained an industrial injury while employed by RW Melanson Cleaning and Painting Company ("Melanson"). Melanson provides temporary laborers to other employers. On that date, relator was assigned by Melanson to work at a facility operated by respondent Warren Fabricating Company ("Warren"). Warren assigned relator the task of periodically refilling the reservoir on a milling machine. The accident occurred when the machine's operator, Jason Jones, unaware that relator was filling the reservoir, turned the machine in motion, causing a crushed type injury to relator's left foot.
 {¶ 9} 2. On September 25, 2001, relator filed a VSSR application that named Melanson as the employer of record. It also indicated that the work was being performed at Warren's facility at the time of the injury. Violations of former Ohio Adm. Code 4121:1-5-05(D) (now Ohio Adm. Code4123:1-5-05[B]) were alleged.
 {¶ 10} 3. In November 2001, Melanson filed an answer denying a VSSR. Melanson's answer stated:
* * * [T]he Ingersol Milling Machine was not shut down for set up and repair. Employee attempted to oil the machine while the machine was being operated and failed to notify its operator that he would be working on the machine.
Employee's injury was the direct result of employee's failing to follow proper procedures, specifically employee's failure to notify operator to shut down the machine. * * *
 {¶ 11} 4. A copy of Melanson's answer was mailed by the commission to relator's counsel on November 29, 2001.
 {¶ 12} 5. The filing of the VSSR application prompted an investigation into the injury by the safety violations investigation unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").
 {¶ 13} 6. On February 21, 2002, the special investigator assigned to do the bureau's investigation issued his report. The report indicates that the special investigator conducted an on-site investigation at the Warren facility on January 17, 2002. The special investigator viewed and photographed the machine involved in relator's injury.
 {¶ 14} 7. The SVIU report contains relator's affidavit, which states in part:
At the time of my accident I was putting in hydraulic oil in a reservoir located on the right side of a set of steps that lead up to a box such as a fuse box or control box. The steps are fixed to the milling machine and move with the machine as it moves from side to side. I was standing with my right foot propped up on the machine balancing an oilcan on my knee. My left foot was half on the machine and half on the concrete landing. (The milling machine and the concrete floor are even with each other).
My accident occurred as I was placing the oil in the machine. The operator, Jason Jones, had come down off of the machine to do something so I started filling the hydraulic fluid because I knew that the machine would not be moving. (The operator's station is located on the opposite side of where I was filling the hydraulic oil, approximately ten feet away from my location. I did not have visual contact with the operator's station while I was filling the oil). As I was filling the machine, Jason must have gone back up to the operator's station without me noticing. The space between the milling machine and the concrete floor was approximately five inches. While I was filling the hydraulic fluid, the machine started moving to the side. My left foot was crushed between the concrete floor and the milling machine as the machine began to travel sideways.
I am not aware of any lockout or tagout procedure for the milling machine where I was injured. I was not instructed to lockout or tagout the machine when filling the oil reservoir. I was never provided any type of lockout device or tagout signs for the machine. To my knowledge the machine was never shut down.
 {¶ 15} 8. In the SVIU report, the special investigator wrote: "The employer indicated at the time of the on-site investigation the machine is only shutdown for repair or setup and it is not necessary to shut the machine down for oiling."
 {¶ 16} 9. Copies of the February 21, 2002 SVIU report were mailed by the bureau on March 20, 2002 to Melanson's counsel and to relator's counsel. The bureau did not mail Warren a copy of the report.
 {¶ 17} 10. On March 22, 2002, relator's counsel requested a record hearing on the VSSR application. On April 3, 2002, a commission staff hearing officer ("SHO") granted relator's request for a record hearing.
 {¶ 18} 11. A prehearing conference was held on April 2, 2003, before an SHO. Thereafter, the SHO mailed a post-prehearing conference letter stating:
At this pre-hearing it came to the attention of the parties that there is another employer against whom this VSSR application could have been filed. * * *
As such, notice is hereby given to the Warren Fabricating Co. and copies of Clair Blair's Affidavit and Special Investigator C. Waynar's report dated 2/21/02 are enclosed.
 {¶ 19} 12. Another prehearing conference was held on June 4, 2003. Both relator and Melanson appeared, through counsel, at this prehearing conference; however, Warren did not appear. Following the prehearing conference, the SHO issued a post-conference letter announcing that the hearing on the VSSR application would be scheduled for September 2, 2003.
 {¶ 20} 13. Following a September 12, 2003 hearing at which Warren did not appear, the SHO issued an order denying the VSSR application on grounds that "the named employer [Melanson] did not have control over the machine or its operator at the time of the claimant's injury."
 {¶ 21} 14. Relator moved for rehearing under Ohio Adm. Code4121-3-20(C).
 {¶ 22} 15. On March 10, 2004, another SHO mailed an order granting rehearing on grounds that the previous SHO failed to adjudicate relator's VSSR claim against Warren.
 {¶ 23} 16. On or about March 24, 2004, Warren's counsel entered an appearance in the VSSR claim.
 {¶ 24} 17. On May 28, 2004, the commission mailed notice that the VSSR application was scheduled for hearing on June 23, 2004.
 {¶ 25} 18. On or about June 22, 2004, Warren served its answer to the VSSR application.
 {¶ 26} 19. On June 23, 2004, the VSSR application was heard by an SHO. The hearing was recorded and transcribed for the record. Counsel for relator and counsel for Warren appeared for the hearing.
 {¶ 27} 20. At the June 23, 2004 hearing, relator's counsel moved to strike Warren's answer to the VSSR application. (Tr. 5, 66.) Relator's counsel further argued that Warren had no right to present evidence at the June 23, 2004 hearing or to otherwise participate in the proceedings because Warren's answer was untimely filed. (Tr. 10.) Noting that Warren had brought two witnesses to the hearing, relator's counsel argued that Warren had no right to present its witnesses at the hearing. (Tr. 13.)
 {¶ 28} 21. At the hearing, the SHO overruled relator's motion to strike Warren's answer and overruled relator's objection to Warren's presentation of evidence. (Tr. 23, 27.)
 {¶ 29} 22. At the hearing, Warren presented two witnesses, i.e., Jason Jones, the operator of the machine when the injury occurred, and Jim Bickerstaff, the machine shop supervisor.
 {¶ 30} 23. Jason Jones testified that the machine runs continuously during the first and second shifts. (Tr. 36.) It is only "shut down" at the end of the second shift. (Tr. 37.) According to Jones, the machine was running at the time of the accident. (Tr. 35.) It was not shut down but was idling. (Tr. 37, 55-56.) According to Jones, filling the reservoir with hydraulic fluid does not require the machine to be shut down. However, the person who fills the reservoir is supposed to notify the machine operator before he goes to the back of the machine to check the fluid level or to fill it. (Tr. 33, 57, 66.) According to Jones, at the time of the injury, the machine was not being adjusted, repaired or cleaned. According to Jones, the machine is designed to put oil down "on the ways that the machine runs on." (Tr. 40.) Thus, the rate at which the machine uses oil depends on the distances it is required to travel during a milling operation. (Tr. 39.) Jones agreed with relator that the reservoir had to be refilled about three to four times in an eight-hour shift. (Tr. 55.)
 {¶ 31} 24. Jim Bickerstaff explained a machine shutdown as follows:
* * * A shutdown is a — like disconnecting it from all power. And it is a pretty big ordeal to restart the machine. I mean, it is a long, drawn out procedure. The machine has to be re-referenced and all of the electrical controls brought back up. So we try to keep everything running as much as possible to avoid problems.
* * *
* * * A true shutdown will never occur unless there is a breakdown with it, or even when we don't have work for it. We keep it running. Now, there is a hydraulic shutdown that would keep the machine from moving and that is done at the end of the second shift operator's turn. He would shut the hydraulics off for the next day. But it keeps all the computer and the machine coordinates set.
(Tr. 73-74.)
 {¶ 32} According to Mr. Bickerstaff, the machine would never be shut down to refill the oil reservoir. According to Mr. Bickerstaff, the procedure for adding oil is:
* * * [W]hat we usually do, if it needs oil, is usually have the — the guy will tell the operator that he is going to check the oil. They will wait, if it needs to be added or not. Whenever they are done, then they will resume work.
(Tr. 76.)
 {¶ 33} According to Mr. Bickerstaff, the machine has an emergency stop button that "will stop the hydraulics and will not allow the machine to move at all." (Tr. 76.) However, the emergency stop button is located near the operator. It cannot be reached by the person who is filling the reservoir. (Tr. 77.)
 {¶ 34} Mr. Bickerstaff also confirmed that the operator, when at the operator station, and the person checking or refilling the reservoir cannot see each other. They are said to be "blind to each other" at that point. (Tr. 77.)
 {¶ 35} 25. Following the June 23, 2004 hearing, the SHO mailed an order on July 7, 2004, denying the VSSR application. The SHO's order states:
It is the finding of the Staff Hearing Officer that the Application for Violation of a Specific Safety Requirement be denied for the reason that the injured worker has not met the burden of demonstrating that the employer was in violation of any relevant safety requirement.
On the date of injury the injured worker was hired by R.W. Melanson Cleaning and Painting and was assigned to work at a facility called Warren Fabricating Company in which he was responsible for sweeping, cleaning, keeping machines oiled, as well as in some cases helping operators set up machines. The injured worker, at the time the injury occurred, was putting hydraulic fluid in a reservoir in a machine called an Ingersol Milling machine. The injured worker's accident occurred when the operator of the machine, not noticing nor was aware that the injured worker was filling the Ingersol Milling machine with hydraulic fluid, turned the machine in motion causing the machine to operate by rotating back and forth sideways, causing the injuries of record by crushing the injured worker's left foot.
* * *
The Staff Hearing Officer notes this injury occurred on 1/13/2000. Therefore, the applicable code chapter of the Workshops and Factories Code is the chapter that became effective 4/1/1999.
As previously indicated, the injured worker was hired by R.W. Melanson Cleaning and Painting, Incoporated. R.W. Melanson Cleaning and Painting assigned the injured worker to work for an employer called Warren Fabricating Company for which he was working on the date of injury herein. Therefore, it is found that R.W. Melanson Cleaning and Painting was a temporary agency that had assigned the injured worker to work for this situs employer, Warren Fabricating Company.
Pursuant to State ex rel. Newman v. Indus. Comm. (1977) 77 Ohio St.3d 71, it was held that the entity that controlled the manner and means of performing the work is the proper employer who is subject to the violation of a specific safety requirement action. Consequently, being that Warren Fabricating Company was the entity that controlled the manner and means of performing the work when the injured worker was injured. It is found that Warren Fabricating Company is the only employer who is subject to possible liability for violation of a specific safety requirement. Therefore, R.W. Melanson Painting and Cleaning is hereby found not liable for any violation of a specific safety requirement liability in this case.
* * *
* * * Section 4121:1-5-05(D)(2) reads as follows:
(2) When machines are shut down.
The employer shall furnish and the employee shall use a device to lock the controls in the "off" position or the employer shall furnish and the employees shall use warning tags when machines are shut down for repair, adjusting, or cleaning.
Injured worker contends that the employer was obligated under Ohio Administrative Code Section 4121:1-5-05(D)(2) to provide a device to lock the controls of the machine in the "off" position or use warning tags when machines are shut down for repair, adjusting, or cleaning.
The employer contends that the requirements of Ohio Administrative Code Section 4121:1-5-05(D)(2) were not applicable under the circumstances of the injured worker's injury. The employer bases this contention on evidence in the record as well as evidence induced at hearing that at the time of the injury, that it does have a lock-out tag procedure in place when in fact their machines are "shut down" for what ever reason, but at the time of injury, said machine was not "shut down" for repairs, adjusting, or cleaning but was in fact operating in "idle" mode, and therefore did not have to be locked or tagged at the time the injured worker was filling the machine with hydraulic fluid.
Clearly[,] the evidence shows that there was no violation of said code section. Injured worker's own testimony presented coupled with the testimony from Jason Jones, machine operator; and Jim Bickerstaff, plant supervisor, all indicate that at the time of injury the Ingersol Milling machine was not "shut down" for repair, adjusting, or cleaning but was still in fact running in "idle" mode. Compliance with Ohio Administrative Code Section 4121:1-5-05(D)(2) only mandates that a device be provided to lock the controls in the "off" position or warning tags be used when the machine is "shut down" for repair, adjusting, or cleaning. Clearly[,] the Ingersol Milling machine operating in "idle" mode cannot be construed to being "shut down," and thus no such violation of Ohio Administrative Code Section 4121:1-5-05(D)(2) can be found.
For the reasons set froth above, the IC-8 application, filed 10/15/2001, is hereby DENIED in its entirety.
Injured worker's counsel's oral request at hearing requesting that no additional evidence and/or testimony be submitted by the employer at said Record hearing due to failing to provide a timely answer to the VSSR application within 30 days, is specifically denied as Ohio Administrative Code Section 4121:1-3-20 fails to indicate such remedy when in fact an employer fails to file a timely answer to the violation of a specific safety requirement application. The Staff Hearing Officer notes that current Industrial Commission policy as well as Ohio Administrative Code Section 4121:1-3-20 indicates that new evidence can be submitted at any time when a record hearing had been requested at a pre-hearing conference.
(Emphasis sic.)
 {¶ 36} 26. Relator moved for rehearing under Ohio Adm. Code4121-3-20(C). On September 3, 2004, the commission denied rehearing.
 {¶ 37} 27. On October 18, 2004, relator, Clare Blair, filed this mandamus action.
Conclusions of Law:
 {¶ 38} Two issues are presented: (1) whether the commission abused its discretion by overruling relator's motion to strike Warren's answer and permitting Warren to present evidence at the June 23, 2004 hearing; and (2) whether the commission abused its discretion in holding that Warren did not violate what is now Ohio Adm. Code 4123:1-5-05(D)(2) because the machine was not "shutdown" at the time of the injury.
 {¶ 39} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 40} Turning to the first issue, Ohio Adm. Code 4121-3-20(B)(1) states:
Upon the filing of an application for an additional award with the commission, the commission shall send a copy of the application to the employer and to its authorized representatives by mail. * * * The employer has thirty days in which to file an answer unless the time is extended, for good cause shown, by a staff hearing officer for a period not to exceed an additional thirty days.
 {¶ 41} Ohio Adm. Code 4121-3-20(B)(4) states:
Either party may request a record hearing but the request shall only be made from the date of filing of the application through the date of the pre-hearing conference. * * * The party requesting a record hearing shall pay for the stenographic services and shall submit a copy of the transcript to the commission, as well as to the opposing party, within thirty days of the date of the hearing. Failure to file a copy of the transcript of the proceedings within the thirty-day period, or within such an extended period as may be granted by the staff hearing officer for good cause shown, shall not delay the rendering of the decision. * * * If a record hearing is held, both parties will be permitted to introduce new evidence at the hearing on the application. If no request is made for a record hearing, no new documentary evidence or testimony will be accepted at the hearing on the merits.
 {¶ 42} As the commission properly noted, Ohio Adm. Code 4121-3-20
fails to indicate that an employer's failure to timely file an answer calls for the remedy proposed by relator. Moreover, as the commission also properly noted, Ohio Adm. Code 4121-3-20(B)(4) allows both parties to introduce new evidence at a record hearing. Thus, the commission properly allowed Warren to present witness testimony at the hearing. The commission's citation of the administrative rules supports its decision to permit Warren to participate at the hearing.
 {¶ 43} Moreover, as Warren additionally asserts, there is no evidence in the record before this court that the commission ever sent a copy of the VSSR application to Warren, as Ohio Adm. Code 4121-3-20(B)(1) requires. Thus, Warren can argue, as it did at the hearing, that the 30 day period in which to file its answer never began to run.
 {¶ 44} In any event, it is difficult to see how relator was prejudiced by the timing of Warren's filing of its answer. Nor has relator shown here that the timing of Warren's filing of its answer gave it an advantage over relator. Accordingly, the commission did not abuse its discretion by denying relator's motion to strike Warren's answer and by allowing Warren to present witness testimony at the hearing.
 {¶ 45} Turning to the second issue, former Chapter 4121:1-5 (now 4123:1-5) provides specific safety requirements for workshops and factories. Former Ohio Adm. Code 4121:1-5-05 (now 4123:1-5-05) is captioned "Auxiliary equipment."
 {¶ 46} Former Ohio Adm. Code 4121:1-5-05(D) (now 4123:1-5-05[D]) is captioned "Machinery control."
 {¶ 47} Former Ohio Adm. Code 4121:1-5-05(D)(2) (now 4123:1-5-05[D][2]) states:
When machines are shut down.
The employer shall furnish and the employees shall use a device to lock the controls in the "off" position or the employer shall furnish and the employees shall use warning tags when machines are shut down for repair, adjusting, or cleaning.
 {¶ 48} Specific safety requirements must be sufficiently specific to "plainly * * * apprise an employer of his legal obligation toward his employees." State ex rel. Trydle v. Indus. Comm. (1972), 32 Ohio St.3d 257,261. Because a VSSR results in a penalty, specific safety requirements must be strictly construed in the employer's favor. State ex rel. Burtonv. Indus. Comm. (1989), 46 Ohio St.3d 170.
 {¶ 49} Under State ex rel. Harris v. Indus. Comm. (1984),12 Ohio St.3d 152, 153, the commission "has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail." See State ex rel. Lamp v. J.A. Croson Co. (1996),75 Ohio St.3d 77, 78-79.
 {¶ 50} Citing Harris and Lamp, relator argues that the commission's interpretation of what is now Ohio Adm. Code 4123:1-5-05(D)(2) is patently illogical. According to relator, because Warren "never" shuts its machine down for repairing, adjusting or cleaning, the commission has effectively permitted Warren to nullify the regulation by simply keeping the machine running during repair, adjusting or cleaning. According to relator:
* * * [I]n the present case, the mere fact that an employer does not shut down the machine down [sic] during cleaning, adjusting or repair does not exempt it from the lock out, tag out requirement. The plain language of the regulation, as well as common sense, assumes that an employer will shut down a machine during a repair, adjusting or cleaning operation. Yet, the Staff Hearing Officer agreed with Warren Fabricating that, by keeping this milling machine in the constant "ready" or "idle" mode, it has exempted itself from the lock out, tag out requirement. It does not require the application of rocket science to understand that keeping a machine running, while it is being cleaned, adjusted or repaired, is a most hazardous and dangerous practice. Yet, the Staff Hearing Officer's decision immunizes the employer who does exactly that. * * *
(Relator's brief at 7-8; emphasis sic.)
 {¶ 51} The magistrate finds relator's argument unpersuasive. The commission did not give a patently illogical interpretation to its safety rule.
 {¶ 52} The Harris case, cited above, is instructive. Robert Harris was cleaning an offset printing press when his right hand and arm were drawn into the ink rollers. The press was kept running during the cleaning process. Harris filed a VSSR application alleging an employer violation of what is now Ohio Adm. Code 4123:1-5-05(D)(2). The commission found that the employer did not violate the safety rule. Harris filed a mandamus action to challenge the commission's decision. On appeal from this court, the Harris court stated, at 154-155:
Ohio Adm. Code 4121:1-5-05(D)(2) states in pertinent part that, "[t]he employer shall furnish and the employees shall use a device to lock the controls in the `off' position or the employer shall furnish and the employees shall use warning tags when machines are shut down for * * * cleaning." All parties concede that it was necessary for appellant to clean the machine while it was running. It was also conceded that there were no warning tags on the press. Appellant contends that the appellee-employer violated Ohio Adm. Code 4121:15-05(D)(2). Appellees argue that the machine was not "shut down for * * * cleaning" and that Ohio Adm. Code 4121:1-50-5(D)(2) does not apply.
Webster's New Collegiate Dictionary (1975) defines "shutdown," as "the cessation or suspension of an activity (as work in a mine or factory)." Appellant essentially argues that the press was, in fact, shut down for purposes of the application of Ohio Adm. Code 4121:1-5-05(D)(2) because the activity which the press performed, printing, had been suspended. The press was running merely to allow the cleaning fluid which appellant was applying to dry. Appellant urges this court to find that the press was "shut down" because it was not engaged in the printing process.
The purpose of this safety rule is to guard against the possibility that a machine might turn on unexpectedly, thereby catching a repairman or another nearby person unawares. While locking controls are preferred, the alternative of using warning tags is made available to alert such persons to the fact that the machine's controls are not or cannot be locked in the "off" position and that, therefore, the machine might turn on suddenly. It was reasonable for the commission to hold that the rule does not apply when the machine is already running, because the fact of its running, itself, provides adequate warning.
* * *
The commission's interpretations of Ohio Adm. Code 4121:15-05(D)(1) and (2) are supported by reason and the facts of record. * * *
 {¶ 53} The Harris case is, at the very least, one example of a situation where it was not unreasonable for the commission to hold inapplicable what is now Ohio Adm. Code 4123:1-5-05(D)(2) when the injury occurred while the machine was running.
 {¶ 54} It is interesting to note that, unlike the instant case, Harris argued unsuccessfully that the press was "shutdown" because it was not engaged in the printing process. Here, relator does not argue that the machine was shut down at the time of the injury. Relator, in effect, argues that the machine should have been shut down and a lockout or tag out procedure implemented during the shutdown. It is undisputed that the machine was not shut down during the time that relator conducted the reservoir check and refill that led to his injury.
 {¶ 55} Relator's argument, in effect, presents the question of whether what is now Ohio Adm. Code 4123:1-5-05(D)(2) plainly apprised Warren that it had a legal obligation to shut its machine down whenever the reservoir was to be checked or refilled. Clearly, the rule does not plainly apprise the employer that the machine must be shut down and a lockout or tag out procedure implemented during the reservoir refill.
 {¶ 56} Jim Bickerstaff and Jason Jones explained to the commission why the machine was not shut down during the reservoir refill. Restarting the machine was described by Bickerstaff as a "pretty big ordeal." (Tr. 73.) Apparently, it was impractical to shut the machine down except at the end of the second shift. There is no evidence that Warren's procedure of keeping the machine running was designed in any way to immunize Warren from the safety rule, as relator has suggested here.
 {¶ 57} According to Jason Jones and Jim Bickerstaff, the person who refills the reservoir is supposed to notify the machine operator before he proceeds to refill the reservoir. Jason Jones testified that relator did not notify him that he was going to refill the reservoir. Relator never disputed Jason Jones' testimony in that regard.
 {¶ 58} The issue here is not whether Warren could have implemented a safer or better procedure for protecting its employee assigned to refill the reservoir. The issue, as previously noted, is whether the safety rule plainly apprised Warren that it was legally obligated to shut its machine down during the reservoir refill procedure and to implement a lockout or tag out procedure. Clearly, the safety rule did not apprise Warren that it was under a legal obligation to shut its machine down during the refill procedure.
 {¶ 59} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.